NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231187-U

NO. 4-23-1187

IN THE APPELLATE COURT

FILED
July 2, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| MELISSA JULIANO, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Jersey County |
| CADE JACKSON, | ) | No. 19L19 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Kenneth R. Deihl, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court did not commit error, or did not commit reversible error, by excluding testimony and opinions from defendant's accident reconstruction expert regarding the speed of defendant's vehicle and whether tire marks at the scene were attributable to defendant's vehicle.

(2) Defendant forfeited his claim that the trial court erred in excluding evidence of an intervening event that aggravated plaintiff's injuries. Assuming, *arguendo*, that the issue was not forfeited, the court did not abuse its discretion.

¶ 2     Plaintiff, Melissa Juliano, brought a negligence action against defendant, Cade Jackson, seeking damages for personal injuries she allegedly sustained as the result of a motor vehicle accident. The trial court granted plaintiff's motion for summary judgment on the issue of medical causation and a jury returned a verdict in plaintiff's favor on the issue of liability. Ultimately, plaintiff was awarded damages totaling $1,463,595.74. Defendant appeals, arguing the court erred by barring (1) testimony at trial from his accident reconstruction expert and (2) evidence at trial of a judicial admission against interest that plaintiff made regarding an

intervening event that aggravated her injuries. He also contends that the cumulative effect of the court's errors requires a new trial. We affirm.

¶ 3                                       I. BACKGROUND

¶ 4        On November 19, 2018, defendant's truck struck the front passenger side of plaintiff's vehicle in the parking lot of Jersey Community High School in Jerseyville, Illinois. The record reflects that there were eyewitnesses to the crash. Surveillance cameras at the school captured video of both vehicles in the parking lot prior to the collision but not the collision itself.

¶ 5                               A. The Parties' Pleadings

¶ 6        In August 2019, plaintiff filed a single-count complaint against defendant, alleging defendant negligently operated his vehicle by (1) failing to keep a proper lookout, (2) failing to warn plaintiff of an impending collision, (3) failing to stop his vehicle to avoid a collision, (4) failing to reduce his speed to avoid a collision, (5) driving his vehicle at a speed greater than was reasonable and proper while on school property, (6) driving while distracted, (7) failing to give a proper signal or sound his horn as a warning, (8) driving at a speed greater than was reasonable and proper under the traffic circumstances, (9) failing to reduce speed to avoid an accident and driving too fast for conditions, and (10) driving his vehicle without safe and adequate brakes. According to plaintiff, prior to striking her vehicle, defendant "accelerated quickly in the parking lot and left skid marks in the asphalt pavement that were 210 feet long." She alleged that as a result of defendant's negligent acts or omissions, she sustained injuries to various parts of her body, including her back, left shoulder, neck, head, and right hip.

¶ 7        In September 2021, plaintiff filed a motion for leave to file an amended complaint to seek punitive damages. The trial court granted the motion over defendant's objection. In February 2022, plaintiff filed her first amended complaint, realleging the negligence count set forth

in her original complaint and adding a second count seeking punitive damages based on defendant's alleged willful and wanton conduct in (1) accelerating quickly and performing a "burnout leaving marks in the asphalt pavement," (2) driving at an excessive rate of speed for the setting in which he drove, and (3) driving recklessly. The same month, defendant filed an answer to plaintiff's complaint, denying the material allegations against him. Later, he was allowed to raise an affirmative defense of contributory fault, alleging plaintiff was negligent for failing to keep a proper lookout for oncoming vehicles and failing to reduce her speed to avoid an accident.

¶ 8                                    B. Pretrial Motions

¶ 9           In September 2022, defendant filed a motion to reconsider the trial court's ruling granting plaintiff leave to seek punitive damages. The court denied the motion; however, during the proceedings, defendant disclosed an accident reconstruction expert, Michael DiTallo, and submitted a report DiTallo prepared regarding the collision. The report stated DiTallo was asked "to conduct a video analysis to determine speed of" defendant's vehicle. To assist with that analysis, DiTallo reviewed a motor vehicle crash report and an incident report from the Jerseyville Police Department, two surveillance videos, photographs of plaintiff's vehicle, an inspection report for plaintiff's vehicle, and the depositions of plaintiff, defendant, and several eyewitnesses. DiTallo also visited the "crash site," where he took photographs with the aid of an unmanned aerial vehicle (UAV), as well as "several 3D scans."

¶ 10          DiTallo selected landmarks from one of the surveillance videos for his speed analysis. Additionally, "[a]n orthomosaic image was created from the UAV photographs and from the 3D scans." The orthomosaic image was used to determine the distance between the three selected landmarks, and "[t]he video was used to determine the time between each landmark," which "was [one] frame or [one] second." DiTallo calculated the "speeds between the landmarks"

- 3 -

and further explained his analysis as follows:

> "I calculated the acceleration rate of [defendant's vehicle] from its start position to the first landmark. I used the average of *** six *** velocities ***. This resulted in an acceleration rate of 7.8 [feet per second squared] (f = 0.24 g's). Based on the acceleration rate and average velocity, it would take 4.4 seconds to reach the first landmark. Based on the time [defendant's vehicle] moved in the video, it took 4 seconds to reach the first landmark. Based on the slow frame rate of the camera, these times are consistent since it cannot be known exactly when the truck started moving within a 1 second resolution."

Based on his analysis of the video, DiTallo concluded that prior to the collision, defendant stopped northbound in the parking lot for approximately eight seconds and then "accelerated northbound at approximately 0.24g's." He determined that approximately 18 to 20 feet from the point of impact of the collision, defendant was traveling between 21 to 25 miles per hour. In his report, DiTallo also noted that tire marks measured at the scene and found to be 210 feet and 10 inches in length would place defendant's vehicle "further south of its starting point [than was] depicted in the [surveillance] video."

¶ 11       In January 2023, plaintiff filed a motion to strike and bar DiTallo's testimony and opinions, arguing they were speculative, unreliable, and not relevant. As an exhibit to her filing, plaintiff attached DiTallo's discovery deposition taken in December 2022. She argued DiTallo's deposition testimony showed he performed only a limited investigation of the collision and that he could not perform a full accident reconstruction because of "the limited evidence available to him." Plaintiff asserted DiTallo (1) lacked information regarding the "measurements of Plaintiff's vehicle's rest position after the collision," (2) never examined either party's vehicle, (3) did not

download any data from either party's vehicle, (4) did not know whether the surface of the parking lot was wet or dry at the time of the collision, (5) did not know if defendant's vehicle had any mechanical issues, and (6) did not know the point of impact for the collision. Plaintiff asserted that DiTallo's testimony showed he did not determine the speed of defendant's vehicle at the time of impact and, instead, concluded that approximately 18 to 20 feet from the point of collision, defendant's vehicle was traveling approximately 21 to 25 miles per hour. Plaintiff also noted testimony from DiTallo that if defendant "release[d] from an intentional burnout" and accelerated quickly, his speed could have been "into the 30s" miles per hour.

¶ 12    Finally, plaintiff complained that DiTallo speculated throughout his deposition. She cited deposition testimony showing that his speed calculations were based on averages that he estimated were within a "close range," effectively opining that defendant was traveling 21 to 25 miles per hour, "plus or minus 2-3 miles per hour," when he was 18 to 20 feet from the point of impact, "plus or minus a few feet." She cited the following colloquies from DiTallo's deposition:

"Q. When you say you are doing averages that are very close, what is the range of very close that these averages are? Are they plus or minus two miles per hour, one mile per hour? How close are we talking?

A. Well, you would have to know, you would have to know a little bit more information to know the exact range for that; but I would say because we are dealing with one second, I would guess that we are plus or minus, and again it is not something that I calculated, but I would say the uncertainty here is probably plus or minus two to three miles an hour. It is pretty close.

* * *

Q. Okay. All right. Then the next paragraph [states] the distance from the

- 5 -

third landmark, which I think on the prior page you have listed as the pole closest to the point of impact, to the area of impact was likely between 18 and 20 feet. Now, likely is not, it is obviously not an exact term. So, what do you mean by likely there? Again are we within a range here?

A. Well, as I said I don't know exactly where the impact is in that intersection, right. But we know it is in the intersection. So, if I don't account for some weird extremes like your client was driving way to the left, you know, I am just trying to be reasonable. It is around 20 feet to impact—

Q. Okay.

A. —from the pole in a straight line to a general area of where impact might be. Could it be 21, 22, could it be 17, absolutely it could be."

¶ 13 Defendant filed a response, arguing DiTallo was a qualified expert in the field of accident reconstruction and that his testimony and opinions offered knowledge beyond the ken of the average juror. He asserted DiTallo's testimony would aid the jury in understanding what transpired. Defendant also asserted DiTallo's testimony and opinions would counter the " 'burnout' narrative" advanced by plaintiff by showing defendant was not "traveling at an incredibly high rate of speed" immediately prior to the collision and that tire marks found at the scene could not be attributed to defendant's vehicle. Defendant attached DiTallo's report to his filing.

¶ 14 Also in January 2023, plaintiff filed a motion for summary judgment on the issue of medical causation. She alleged that her treating physicians—Dr. Kristen Stabell, her primary care physician, and Dr. Kevin Rutz, her orthopedic surgeon—opined the motor vehicle collision at issue caused her to suffer a disc herniation at the C3-4 level of her cervical spine, along with

"associated symptoms." Dr. Stabell also opined that plaintiff suffered a concussion and headaches related to the collision. Finally, she alleged that both doctors opined that the treatment they provided and recommended for her, including her cervical spine surgery, was reasonable and necessary to address the injuries she sustained as a result of the collision. Plaintiff attached the discovery depositions of both doctors to her motion and asserted there was "no other medical testimony" in the case to dispute Dr. Rutz's and Dr. Stabell's opinions.

¶ 15 Defendant filed a response to plaintiff's motion, arguing a jury should be allowed to consider and weigh the credibility of plaintiff's doctors and that it could reject their opinions. He also argued that in her interrogatory answers during discovery, plaintiff admitted "that an intervening event occurred that *** she believed aggravated her injury." To support that claim, defendant attached to his response a portion of plaintiff's answers to interrogatories, which stated as follows:

"INTEROGATORY NO. 12: Have you suffered any injury or prolonged, serious and/or chronic illness since the date of the occurrence? If so, state when you were injured and/or ill, where and how you were injured and/or ill, describe the injuries and/or the illness suffered, and state the name and address of each physician or other health care professional, hospital and/or clinic rendering your treatment for each injury and/or chronic illness.

ANSWER: Plaintiff objects to this interrogatory in that it is overbroad in time and scope, it seeks irrelevant information not reasonably calculated to discovering pertinent and material evidence, it constitutes a fishing expedition, and it invades Plaintiff's patient doctor confidentiality and privacy. Subject to, and without waiving said objections, Plaintiff had an incident at a ball game where a

woman was falling down and grabbed her head to break her fall. Plaintiff believes that if she did not have this occurrence it would not have injured her, but because of the injuries from this car accident, this incident aggravated her head injury."

¶ 16 In March 2023, plaintiff filed a motion *in limine*, seeking to exclude evidence at trial that her alleged injuries were causally related to an intervening event on the basis that such evidence would not be supported by competent expert testimony or opinion. Plaintiff relied on the Illinois Supreme Court's decision in *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 733 N.E. 2d 1275 (2000), for the proposition that a defendant who seeks to introduce evidence of a plaintiff's prior injury at trial must introduce expert medical testimony showing why the prior injury is relevant to causation, damages, or some other issue of consequence. Plaintiff asserted that the rule in *Voykin* also applied to subsequent injuries, not only prior injuries.

¶ 17 In March 2023, the trial court conducted a hearing, during which the parties presented argument on plaintiff's motions (1) to strike and bar DiTallo's testimony and opinions, (2) for summary judgment on medical causation, and (3) to bar evidence of an intervening event. The court took the matters under advisement and, later the same month, made a docket entry granting each motion. In April 2023, defendant filed motions to reconsider the trial court's grant of all three motions. Following a hearing in May 2023, the court denied each motion to reconsider.

¶ 18 C. Jury Trial and Posttrial Proceedings

¶ 19 In June 2023, a jury trial was conducted in the matter. Plaintiff testified on her own behalf and called defendant to testify as an adverse witness. She also presented testimony from eyewitnesses to the collision or its immediate aftermath, including (1) Norman Fabry, a teacher at Jersey Community High School; (2) Cassidy Loy, a high school student; (3) Richard Portwood, the high school's resource officer; and (4) police officer Robert Walker. Plaintiff further presented

evidence regarding her physical condition after the collision, including testimony from (1) her husband, (2) a former coworker, and (3) her treating medical providers, Dr. Rutz and Dr. Stabell. During his case-in-chief, defendant called plaintiff as an adverse witness.

¶ 20    The evidence at trial showed that on November 19, 2018, plaintiff went to Jersey Community High School to pick up her son for lunch. She was driving a Ford Fusion and traveling eastbound in the school's parking lot. The school had an "open campus" at that time, and other individuals and vehicles were present in the parking lot. Defendant, who was then 16 years old, was not a student at the school but was present in the parking lot picking up friends to also go to lunch. Defendant's vehicle was a 2003 Chevrolet Duramax diesel truck with "stacks" in the bed of the truck. His vehicle traveled northbound in the parking lot and collided with plaintiff's vehicle where their paths intersected. Defendant's vehicle struck the front passenger side of plaintiff's vehicle and pushed it so that it ended up pointing northbound. Plaintiff testified her vehicle was "totaled" as a result of the crash.

¶ 21    Both Fabry and Loy observed defendant's vehicle in the parking lot immediately prior to the collision. Fabry testified that as he was about to leave the school for lunch, he heard squealing tires and "a diesel engine very loudly roaring." He looked out a window and saw defendant's truck moving through the parking lot in a northerly direction. Fabry characterized defendant's speed as being "[e]xcessive" for a parking lot, and he stated that "[i]t sounded as if [defendant] was accelerating the entire time as he was going by." Fabry testified he did not see the collision but "heard braking" and saw the rear end of the truck "raised up." Following the collision, Fabry went to the scene and saw tire marks on the pavement. When asked whether the parking lot was wet on the day of the accident, Fabry responded that "it was a dry day."

¶ 22    Loy recalled walking with a friend to the parking lot to go to lunch when she heard

"some loud noises" that sounded "[l]ike a truck accelerating." She observed defendant's truck and remembered telling her friend that defendant was "an idiot" because she perceived that he was "doing a burnout in the high school parking lot." Loy testified that defendant was "doing an intentional burnout." She stated that "when he release[d] from that," his truck sped up, and he was traveling at an unsafe speed for that location when the collision occurred.

¶ 23        Loy also observed plaintiff's vehicle prior to the collision. She testified she would not have characterized plaintiff's driving as unsafe. She observed plaintiff's vehicle yield "for a few seconds" at the intersection where the collision occurred before moving forward, testifying as follows:

"She kind of yielded for a few seconds, and then continued to pull out, and at that time [defendant's] truck was farther back, but *** once that his tires caught that's when his vehicle flung forward at a faster speed than what he had priorly [*sic*] been going."

When the vehicles collided, plaintiff's vehicle "got shoved and pushed." Loy did not remember the day of the collision being "rainy."

¶ 24        During his testimony, defendant initially denied causing the collision at issue. However, he acknowledged that he answered requests to admit in the case and admitted that he was "the cause of the crash."

¶ 25        Defendant was shown portions of a surveillance video, which he testified fairly and accurately depicted his truck prior to the collision. When asked whether he saw smoke coming out from behind his tires on the video as his vehicle began to move, defendant responded that it "[was] hard to say" if what was depicted in the video was "for sure smoke." He agreed that a "burnout" occurs when the driver of a vehicle applies both the accelerator and the brake at the same time.

Defendant denied, however, that he had been "doing a burnout." He also acknowledged that a "burnout" can create tire marks. Defendant agreed there were tire marks in the parking lot in the area of the crash that extended to the approximate location of where he had picked up his friends. When asked whether those were his tire marks, defendant responded, "They very well could be, yes." He explained that he had "problems with [his] brakes and [he] was bouncing back and forth between [his] gas and [his] brakes." He denied having his feet on both the brake and the accelerator at the same time.

¶ 26      Defendant testified he did not see plaintiff's vehicle until she was directly in front of him and that he "slammed" on his brakes. He stated it was not raining at the time of the collision, but the parking lot was wet. Defendant also agreed that "a cautious driver in [the] parking lot would have had to drive at a speed where [the driver] could stop at a moment's notice." He acknowledged that he had been traveling above such a speed.

¶ 27      Portwood testified he was present at the high school when the collision occurred. He recalled hearing "the exhaust of a vehicle" and then being asked by Fabry if he had seen the truck in the parking lot "doing a burnout." Another teacher alerted him that there had been an accident, and he responded to the parking lot. Initially, Portwood spoke with plaintiff, who appeared to be in pain, complained of pain in her back and neck, and stated she needed medical attention. Although Portwood did not recall what the weather was like on the day of the collision, he noted that an incident report prepared by another officer mentioned "the pavement being wet." Portwood recalled seeing what appeared to be "fresh" tire marks after the collision, and he was asked to measure the marks with a measuring wheel. The tire marks measured 210 feet and 10 inches in length.

¶ 28      Portwood testified he also obtained statements from eyewitnesses to the collision

and the occupants of defendant's vehicle. Two of the individuals in defendant's vehicle declined to provide written statements; however, they did report that prior to the collision, defendant did "nothing wrong and took off normal," and that defendant was not driving "at a high rate of speed." Portwood acknowledged that he did not measure the width of the tire marks left at the scene or the width of defendant's tires.

¶ 29     Walker testified he responded to the high school parking lot after the collision and prepared a traffic crash report regarding the accident. In his report, he indicated that the road surface was dry, and the weather conditions were clear. He also identified defendant's reckless driving and failure to reduce speed as contributory causes of the collision.

¶ 30     Evidence showed that as a result of the collision, plaintiff lost consciousness and experienced various symptoms, including headaches and neck pain. She was diagnosed with a concussion and, later, a disc herniation at the C3-4 level of her spine, which her treating physicians opined were related to the November 2018 vehicle collision. In July 2020, plaintiff underwent cervical disc replacement surgery. In February 2022, she was diagnosed with esophagitis. Plaintiff's primary care physician attributed that condition to plaintiff's long-term use of Motrin, which she had been taking for the pain and discomfort she experienced as a result of the motor vehicle collision.

¶ 31     At the close of plaintiff's case, her counsel stated plaintiff wanted to "withdraw" her punitive damages count from consideration and asked the trial court to allow her "to amend [her] Complaint to drop that count." After defendant's counsel stated he had no objection, the court stated it recognized that "punitive damages [was] now off the table." Plaintiff also moved for a directed finding as to the amounts of her medical bills and lost wages, totaling $147,370 and $16,225.74, respectively, arguing those amounts were undisputed. The record indicates the parties

ultimately reached an agreement as to those amounts, and they were included on verdict forms provided to the jury.

¶ 32 The record further reflects that outside the presence of the jury, defendant presented DiTallo's testimony in a formal offer of proof. On questioning by defendant's counsel, DiTallo testified he worked for a consulting firm that focused on crash investigation, crash reconstruction, and mechanical civil engineering. At defendant's request, he conducted a "limited investigation" into the motor vehicle collision at issue by analyzing the school surveillance videos. DiTallo noted there was not enough information available in the case for him to perform "a full crash reconstruction." To perform a full reconstruction, DiTallo would have wanted to (1) see both vehicles involved in the collision, (2) measure the damage profiles, (3) have information downloaded from the vehicles, and (4) have physical evidence that showed "exactly where the impact took place." However, DiTallo maintained that the opinions he provided in the case were not any less reliable because he could not perform a full reconstruction, asserting they "were based on methodologies and practices that are taught, that are used, that are accurate, and have no *** direct bearing on the fact that [he] couldn't finish or do a complete reconstruction."

¶ 33 In performing his investigation, DiTallo visited the accident site and used a drone to take photographs. The photographs resulted in an "orthomosaic drawing," from which he could accurately take measurements. He also did "a mathematical analysis called a video analysis using forensic software." DiTallo noted there were two surveillance videos available for analysis, one that provided a stationary view and one that provided a panning view. Neither video captured the actual collision. DiTallo explained that he used the nonpanning video to identify landmarks and broke the video up into frames. He then calculated "an average velocity" using "the time from those frames over the proper distance based on [defendant's truck's] movements at those

landmarks."

¶ 34    DiTallo testified that, in the accident reconstruction field, it was typical to have approximations in arriving at conclusions because crash reconstruction was "an applied science" and it was rare to "know everything perfectly." He acknowledged he did not know exactly where the impact of the collision occurred, and he approximated that the last average speed calculation that he made was a distance of 18 to 20 feet from "where impact could be." DiTallo also stated he used "a simple time distance formula" to calculate defendant's speeds and described the methodology he used as one that is taught and used "all the time" and "based on science." He testified that his speed calculations were accurate, plus or minus two to three miles per hour, noting that only a short distance was involved, and defendant's vehicle would not "be able to flex its speed drastically in that short amount of distance." Ultimately, DiTallo testified his calculations showed that, prior to impact, defendant's speeds were "in the lower 20's," and that the maximum speed defendant's vehicle could have been traveling was 28.6 miles per hour.

¶ 35    DiTallo stated he had also considered the tire marks that had been measured to be 210 feet and 10 inches in length. He opined that based on the information he collected from his video analysis, the tire marks could not be attributed to defendant's vehicle, explaining as follows:

> "Well, 210 feet is a measurement. So if you start from that approximate area of impact and you move back 210 feet, it's illustrated where that would be. And we can look at the video and see where the pickup truck stopped for 8 seconds. And that mark is—the pick-up truck's stop position is beyond where the 210 feet began."

¶ 36    On cross-examination by plaintiff's counsel, DiTallo acknowledged that his video analysis provided "averages" and reasserted that they were accurate within a range of "plus or minus 2 to 3" miles per hour. He agreed, however, that he did not have the information to know

the "exact range" and that he never calculated "how close [his] ranges were at any time prior to [his] deposition" because he "didn't know that exact location [of impact]." The following colloquy then occurred between plaintiff's counsel and DiTallo:

"Q: You said that you didn't—you didn't calculate the ranges before your deposition ***. Instead you guessed, you guessed how close those averages were at your deposition?

A. Based on my experience, I did.

* * *

Q. Okay. And so your guess at your deposition was that the averages were probably plus or minus 2 to 3 miles per hour, correct?

A. They were—the uncertainty was plus or minus 2 miles an hour.

Q. And your word was that that was a guess?

A. It is."

DiTallo characterized his determination of the two-to-three mile-per-hour range as an "educated guess." Further, he agreed that his opinion that his last speed calculation was made 18 to 20 feet away from the point of impact was "plus or minus a few feet." He also acknowledged that he did not know defendant's speed at the time of impact.

¶ 37    DiTallo testified that he was aware of Loy's statement that prior to the collision, defendant "was doing an intentional burnout, released from it, accelerated quickly and struck [plaintiff's] vehicle." He did not dispute that he testified at his deposition that if Loy's statement was accurate, defendant "could get [his vehicle] up into the 30 miles per hour." DiTallo also agreed that analyzing what actually happened at impact was "very evidence poor and problematic."

¶ 38    Regarding his tire mark opinions, DiTallo testified that he would expect the

possibility of tire marks depending on how wet the road was. If the road was wet, a burnout might not leave tire marks. DiTallo believed photographs of the scene showed a wet surface and that they also appeared to show tire marks. He testified he did not know if the tire marks were made by defendant's vehicle. DiTallo did not believe that tire marks measuring 210 feet in length could be attributed to defendant because the starting point for that measurement would have put defendant's vehicle further back than what he saw in the surveillance video. He acknowledged that deposition testimony from defendant's front seat passenger placed the starting point of defendant's vehicle close to the starting point of the 210 feet measurement. Additionally, he acknowledged that although he visited the site of the collision, he did not take physical measurements and, instead, relied on the images taken by the drone.

¶ 39　　　　Defendant also made an offer of proof with respect to plaintiff's testimony regarding an intervening event that might have aggravated her cervical injury. Specifically, defendant's counsel asserted as follows:

> "[I]f she were called to testify[,] I believe [plaintiff] would testify regarding this incident at a ball game where she stated that she was at—watching her daughter at a cheerleading event and there was a woman walking down bleachers who lost her balance, put her hand on top of the Plaintiff's head to catch herself. [Plaintiff] stated: [']In a normal instance, had I never been in the accident, I would have been okay. But because I was suffering whiplash from the accident and my muscles were tense anyway, it irritated my neck, caused severe muscle spasms,['] and that is why [plaintiff] followed up with [medical treatment] after the incident. Further she would testify that she would not describe it as a setback. It just caused muscle spasms. She went to the chiropractor and he rubbed her neck out and adjusted her.

And then she went back to her base line headaches."

¶ 40    Plaintiff's counsel responded that at her deposition, plaintiff also testified the incident "in no way aggravated her neck," and her subsequent medical visits were not specifically for that incident and had previously been scheduled for "injuries from the crash." Counsel further represented that plaintiff's primary care doctor characterized the incident "as not an aggravation of [plaintiff's] neck injury." In response to argument by defendant's counsel that plaintiff also referenced the incident when answering interrogatories, plaintiff's counsel asserted that plaintiff's answers "were subject to objections that were never ruled on."

¶ 41    The trial court instructed the jury that plaintiff claimed defendant was negligent because he (1) drove too fast in the parking lot, (2) failed to reduce his speed to avoid a collision, (3) performed a "burnout" in the parking lot, and (4) drove a vehicle that he knew had brake issues. The jury was also instructed that defendant claimed plaintiff was contributorily negligent because she (1) failed to keep a proper lookout and (2) failed to reduce her speed to avoid an accident. Ultimately, the jury returned a verdict in favor of plaintiff and against defendant, finding plaintiff was not contributorily negligent and assessing damages totaling $1,463,595.74.

¶ 42    In July 2023, defendant filed a posttrial motion for a new trial or alternative relief. He argued the trial court erred in excluding (1) DiTallo's testimony and opinions and (2) evidence of a postaccident event that caused an aggravation of plaintiff's pain symptoms. In September 2023, the court conducted a hearing on defendant's motion and took the matter under advisement. In October 2023, it made a docket entry denying the motion.

¶ 43    This appeal followed.

¶ 44                                II. ANALYSIS

¶ 45                          A. Expert Witness Testimony

¶ 46       On appeal, defendant first argues he was denied a fair trial by the trial court's grant

of plaintiff's motion to bar testimony and opinions from DiTallo, his accident reconstruction

expert. He notes the court never articulated a specific basis for its ruling, indicating it relied on the

reasons argued by plaintiff in pursuing her motion. According to defendant, plaintiff challenged

DiTallo's testimony by arguing that his methodology was not (1) generally accepted in the field

of accident reconstruction or (2) reliable. He maintains the court erred because DiTallo's testimony

at his deposition and in the offer of proof established that the methodology and scientific principles

he relied upon in forming his opinions regarding speed and distance were generally accepted in

his field and that his methodology was also "sound." Defendant further contends that any finding

by the court that DiTallo was not qualified to testify as an accident reconstruction expert would

have been an abuse of the court's discretion.

¶ 47       In response, plaintiff asserts that her challenges to DiTallo's testimony and opinions

were never that he was unqualified as an accident reconstruction expert or that his methodologies

were not generally accepted or unreliable. Rather, her primary contention was that DiTallo's

opinions were inadmissible because they were "based on a lack of reliable information and

amounted to guess and speculation." Plaintiff also contends that she raised the argument that

DiTallo's opinions concerned matters that were not beyond the ken of the average juror or

layperson, *i.e.*, defendant's speed and the presence of tire marks after the collision. Finally, she

contends that even assuming an error occurred, defendant suffered no prejudice.

¶ 48       "Expert testimony is admissible if the proffered expert is qualified by knowledge,

skill, experience, training, or education, and the testimony will assist the trier of fact in

understanding the evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 24, 787 N.E.2d 796, 809 (2003). "An

expert need only have knowledge and experience beyond that of an average citizen." *Thompson v.*

*Gordon*, 221 Ill. 2d 414, 429, 851 N.E.2d 1231, 1240 (2006). Like other expert witness testimony, "expert reconstruction testimony is proper, even where there is an eyewitness, if what the expert offers is knowledge and application of principles of science beyond the ken of the average juror." (Internal quotation marks omitted.) *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 546, 658 N.E.2d 371, 374 (1995).

¶ 49    Typically, the factual basis for an expert witness's opinion goes only to the weight of the evidence and not its sufficiency. *Snelson*, 204 Ill. 2d at 26. "The information used or not used by an expert is generally not a sufficient reason to bar an expert's testimony as lacking foundation." *Molitor v. BNSF Ry. Co.*, 2022 IL App (1st) 211486, ¶ 53, 214 N.E.3d 324. However, "[a]n expert witness' opinion cannot be based on mere conjecture and guess." *Dyback v. Weber*, 114 Ill. 2d 232, 244, 500 N.E.2d 8, 13 (1986). "If an expert's opinion is based on varying or uncertain factors to the extent that the expert is required to guess or surmise, the opinion should be barred as speculative and unreliable." *Freeman v. Crays*, 2018 IL App (2d) 170169, ¶ 18, 98 N.E.3d 571; see *Reed v. Jackson Park Hospital Foundation*, 325 Ill. App. 3d 835, 844, 758 N.E.2d 868, 876 (2001) (finding no abuse of discretion in barring expert testimony where the expert's opinions were based on "an educated guess").

¶ 50    "[W]hether to admit expert testimony is within the sound discretion of the trial court." *Thompson*, 221 Ill. 2d at 428. A decision constitutes an abuse of discretion only when it "is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *People v. Lovejoy*, 235 Ill. 2d 97, 125, 919 N.E.2d 843, 858 (2009).

¶ 51    Initially, we agree with plaintiff that defendant has misconstrued the bases of her objections to DiTallo's opinions below. The record reflects plaintiff did not challenge DiTallo's methodology. Instead, her primary argument before the trial court was that DiTallo's opinions

lacked a sufficient factual foundation, such that they were based on speculation, guess, surmise, and conjecture. In connection with the proceedings on her motion to bar, plaintiff also raised an argument that DiTallo's opinions did not assist the trier of fact because they did not involve specialized knowledge or an application of scientific principles that were beyond the ken of the average juror. Plaintiff raises the same arguments on appeal.

¶ 52 Defendant addresses plaintiff's contentions by arguing DiTallo's opinions were not speculative or lacking in foundation because he was the only person to examine the video evidence, and no dispute existed that the video showed the scene of the accident and the vehicles involved. He also argued that DiTallo's opinions "would have assisted the trier of fact to understand the evidence."

¶ 53 Here, the record shows defendant first sought to offer an opinion from DiTallo that approximately 18 to 20 feet from where the parties' vehicles collided, defendant was traveling at a speed of around 21 and 25 miles per hour. DiTallo's testimony from his discovery deposition and in the offer of proof established that his speed calculations were based on speed averages, which he testified were accurate within a "close range." However, when questioned further at his deposition regarding what he meant by "close range," DiTallo testified that the range was "not something that [he] calculated" and that he would "have to know a little bit more information to know the exact range." DiTallo stated he "would guess" that the range was "plus or minus two to three miles an hour." He provided similar testimony in the offer of proof, agreeing that he did not have sufficient information to know the "exact range" and that prior to his deposition, he never calculated "how close [his] ranges were." DiTallo characterized his testimony regarding the range within which his speed calculations were accurate as an "educated guess." Under such circumstances, the trial court would not have abused its discretion in finding DiTallo's speed

calculations were based on speculation, guess, and conjecture.

¶ 54        Additionally, as plaintiff points out on appeal, our supreme court has held "that speed is recognized as a subject about which a layman can express an opinion." (Internal quotation marks omitted.) *Watkins v. Schmitt*, 172 Ill. 2d 193, 207, 665 N.E.2d 1379, 1386 (1996). "In general, when a witness is familiar with the speed of a vehicle[,] he may testify to the speed he observed, and if a witness is unable to estimate miles per hour[,] he may state it as fast or slow." *Id.* "A lay person is not required to have any specialized knowledge in engineering or to perform scientific calculations to estimate the speed of an automobile." *Id.*

¶ 55        In *Watkins*, the supreme court considered whether the trial court erred in barring testimony from the plaintiff's accident reconstruction expert regarding the speed of the defendant's vehicle. *Id.* at 204. In finding no error in the exclusion of such testimony, the court initially agreed with the plaintiff that the existence of eyewitness testimony on the same subject was not dispositive of whether the expert testimony was admissible. *Id.* at 206 ( "[T]he fact that there were three eyewitnesses who could testify as to the speed of [the defendant's vehicle did] not amount to an absolute bar to [the] expert reconstruction testimony."). Instead, the court considered "whether in addition to eyewitness testimony, expert reconstruction testimony would be needed to explain scientific principles to a jury and enable it to make factual determinations." *Id.* The court concluded that "any lay person with a reasonable opportunity to observe and ordinary experience with moving vehicles can estimate the speed of a car" and "a jury would be presented with sufficient evidence, through eyewitness testimony, to make its own factual determinations." *Id.*

¶ 56        In this instance, plaintiff's negligence allegations included claims that defendant drove too fast in the parking lot and failed to reduce his speed to avoid a collision. Two eyewitnesses testified at trial that they observed defendant's truck before the collision and that he

was driving at an "excessive" or "unsafe" speed for the parking lot. Defendant also acknowledged that "a cautious driver in [the] parking lot would have had to drive at a speed where [the driver] could stop at a moment's notice," and that he was traveling above such a speed. Moreover, on appeal, plaintiff represents that jurors also had the opportunity to observe defendant's speed for themselves because they viewed the surveillance video footage, which showed defendant driving his vehicle in the moments prior to the collision. Although no surveillance footage is contained within the appellate record, defendant does not dispute plaintiff's claim regarding what the surveillance videos showed. As in *Watkins*, we find that the speed of defendant's vehicle could be estimated by any layperson and DiTallo's opinion regarding defendant's speed was not needed to explain any scientific principle to the jury.

¶ 57    The second opinion defendant sought to offer from DiTallo was that the tire marks measured by the police at a length of 210 feet and 10 inches, if left by defendant, would place his northbound vehicle further south of the location that the surveillance video depicted as his starting point. DiTallo's report contained a diagram, indicating there was a distance of five parking spaces between what the surveillance video depicted as defendant's starting point and where the tire mark measurement began. Accordingly, he opined that tire marks measuring 210 feet and 10 inches in length could not be attributed to defendant's vehicle.

¶ 58    Plaintiff argues DiTallo's tire mark opinion was based on guess and speculation because he chose a "perceived" starting point of defendant's vehicle from the surveillance video "and measured from that point to a point of impact he admit[ted] that he [did] not know." Plaintiff also points out that there was other information DiTallo lacked, including the final resting position of her vehicle, whether the parking lot surface was wet or dry, whether defendant's vehicle had any mechanical issues, and the ultimate testimony of the witnesses at trial.

¶ 59        As noted, however, the factual basis for an expert witness's opinion goes only to the weight of the evidence and not its sufficiency. *Snelson*, 204 Ill. 2d at 26. Thus, "[t]he information used or not used by an expert is generally not a sufficient reason to bar an expert's testimony as lacking foundation." *Molitor*, 2022 IL App (1st) 211486, ¶ 53. In this case, DiTallo's tire mark opinion was based on information gleaned from the surveillance videos and measurements of the tire marks taken by the police. Although DiTallo admitted he did not know the precise point of impact for the collision, there is no dispute that the impact occurred at a particular and known intersection within the high school's parking lot. DiTallo's testimony showed the point of impact was determinable within a few feet. The information plaintiff argues that DiTallo lacked in forming his opinions regarding distance were matters for cross-examination and not a basis for finding his tire mark opinion was based on guess or conjecture.

¶ 60        Plaintiff also contends "tire marks are not beyond the ken of the average juror and layperson." She argues that tire marks are physical evidence that may be testified to by eyewitnesses, and therefore, they are not properly within the scope of expert testimony. We agree that the observation of tire marks at the scene by the eyewitnesses constituted physical evidence. See *Watkins*, 172 Ill. 2d at 208 ("Evidence of skid marks is simply physical evidence which [a police officer] observed as an eyewitness at the scene of the accident."). However, DiTallo's opinions went beyond whether or not tire marks were observable in the parking lot after the collision. They concerned, instead, whether the tire marks could be attributed to defendant's vehicle given their length as measured and the video evidence of defendant's positioning. Ultimately, DiTallo's testimony could have assisted the jury in making distance determinations and understanding the surveillance video evidence. Accordingly, we disagree with plaintiff's assertion that DiTallo's tire mark opinion was not beyond the ken of the average layperson or juror

and find the trial court abused its discretion by excluding that opinion.

¶ 61 On appeal, plaintiff alternatively argues that even assuming the trial court erred in barring DiTallo's opinions, reversal is unwarranted because defendant suffered no prejudice. An error in the exclusion of expert testimony does not warrant reversal absent the existence of substantial prejudice affecting the outcome of trial. *Holston v. Sisters of Third Order of St. Francis*, 165 Ill. 2d 150, 170, 650 N.E.2d 985, 995 (1995).

¶ 62 Here, we find insufficient prejudice to defendant in the exclusion of DiTallo's tire mark opinions to warrant a reversal. The purpose of the tire mark evidence was to show that defendant had performed a "burnout" before the collision and to support evidence that he was traveling at an unsafe speed in the parking lot. As expressed above, there was sufficient other evidence from which the jury could determine defendant's speed, including surveillance video that showed defendant's vehicle immediately prior to the collision. Notably, plaintiff's negligence allegations were that defendant (1) drove too fast in the parking lot, (2) failed to reduce his speed to avoid a collision, (3) performed a "burnout" in the parking lot, or (4) drove a vehicle that he knew had brake issues. As plaintiff points out on appeal, "[w]hen a jury considers many alternative grounds for a general verdict, a reviewing court can sustain the general verdict, without speculating as to which ground the jury found persuasive, if any one of those grounds support the general verdict." *Hany v. General Electric Co.*, 221 Ill. App. 3d 390, 400, 581 N.E.2d 1213, 1219 (1991). "[I]f there was sufficient evidence under any one theory to support a finding of negligence by [the] defendant, then the judgment must be affirmed." *Alvis v. Henderson Obstetrics, S.C.*, 227 Ill. App. 3d 1012, 1017-18, 592 N.E.2d 678, 682 (1992).

¶ 63 Additionally, DiTallo testified in his offer of proof that defendant's vehicle may not have left tire marks even if he had performed a burnout. Moreover, plaintiff argues on appeal

that video evidence in the case definitively proved that defendant's truck left the tire marks that were observed after the collision. She suggests DiTallo conceded that point during his offer of proof and points to the following colloquy:

"Q. [(By plaintiff's counsel)] Mr. DiTallo, you recognize this footage from before the crash in the panning video here?

* * *

A. And your question is, is this before?

Q. That's before the crash?

A. It is before.

Q. And you believe this approximate area is where the crash occurred?

A. It would make sense.

Q. Okay. This is after the crash. Do you see skid marks in that same approximate area?

A. Can I go back? I see a mark that's similar to this mark.

Q. Okay. And that's right after the crash. So [defendant] did leave skid marks after this crash, right?

A. Well, I can't look at the type of mark it is to tell you if it's a skid mark or—every mark has a mark that tells you what it is by studying the mark. So there is some mark there that looks like a tire mark. Could be a skid mark."

DiTallo's testimony supports plaintiff's suggestion that the video evidence showed tire marks in the parking lot after the collision but not before. Again, although the appellate record does not contain the surveillance video footage, defendant does not dispute plaintiff's assertions as to what is depicted in the video.

¶ 64    For the reasons expressed above, we find the trial court did not abuse its discretion in barring DiTallo's testimony and opinions regarding his speed calculations. Although we find the court did err in barring DiTallo's tire mark testimony and opinions, we find defendant was not sufficiently prejudiced by the error to warrant a reversal. Under the circumstances presented, defendant was not denied a fair trial.

¶ 65                             B. Intervening Event

¶ 66    On appeal, defendant next contends the trial court erred by excluding evidence of an intervening event that allegedly aggravated plaintiff's cervical injury. He argues plaintiff made a judicial admission in her interrogatory answers regarding "how she felt" after an incident during which a woman fell and grabbed plaintiff's head to break the woman's fall. Defendant asserts the incident was relevant to plaintiff's need for cervical spine surgery, "which accounted for the vast majority of her medical specials." Further, he argues that because plaintiff's statements regarding the intervening event constituted a judicial admission, he was not required to seek out evidence to support the admission. He also contends that under the supreme court's decision in *Voykin*, medical expert testimony is not necessary to support evidence of an intervening injury when a layperson can readily appraise the relationship between the intervening injury and the original condition of ill-being. Defendant asserts that, here, plaintiff, a layperson, "appraised the relationship when she disclosed that she had this other injury."

¶ 67    Initially, we note that defendant's claim regarding evidence of an injury sustained in an unrelated postaccident incident is relevant to issues of medical causation, and the record reflects the trial court granted summary judgment in plaintiff's favor as to that issue. On appeal, plaintiff suggests defendant has forfeited any challenge to the court's summary judgment ruling by failing to explicitly challenge the ruling in his appellant's brief. Specifically, although defendant

- 26 -

referenced the court "entering summary judgment on medical causation" as an issue presented for review, he failed to otherwise address or analyze the propriety of the court's ruling in either the "standard of review" or "argument" sections of his appellant's brief. Instead, when arguing that the court erred in excluding evidence of the alleged intervening event, defendant references only the court's grant of plaintiff's motion *in limine* to bar him from presenting such evidence at trial. As plaintiff contends, "[p]oints not argued [in an appellant's brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Under the circumstances presented, we find that defendant forfeited any challenge to the court's summary judgment ruling.

¶ 68        Plaintiff also argues that defendant has forfeited any challenge to the exclusion of her alleged judicial admission of an intervening event because he (1) never specifically argued her interrogatory answer was a judicial admission before the trial court, (2) never requested the court rule upon the objections she raised in her interrogatory answer, and (3) failed to get permission to make an informal offer of proof regarding her alleged judicial admission. In his reply brief, defendant has failed to present any reasoned argument addressing or refuting at least two of plaintiff's specific forfeiture assertions. Again, a finding of forfeiture is warranted under such circumstances. See *Department of Central Management Services/Department of State Police v. Illinois Labor Relations Board*, 2012 IL App (4th) 110356, ¶ 26, 980 N.E.2d 1259 (finding an issue forfeited where an appellant did not respond in a reply brief to an appellee's forfeiture argument).

¶ 69        Additionally, even setting aside the issue of forfeiture, we would find no abuse of discretion by the trial court in excluding the evidence at issue. "Generally speaking, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion." *In re Leona W.*, 228

Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008). The court's ruling "will not be disturbed on review absent an abuse of that discretion." *Id.* An abuse of discretion does not occur "unless it can be said that no reasonable man would take the view adopted by the court." *Id.* "Moreover, even where an abuse of discretion has occurred, it will not warrant reversal of the judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial." *Id.*

¶ 70    "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *In re Estate of Rennick*, 181 Ill. 2d 395, 406, 692 N.E.2d 1150, 1156 (1998). They "have the effect of withdrawing a fact from issue and cannot be contradicted at trial." *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 118, 125 N.E.3d 509.

¶ 71    Here, defendant suggests plaintiff made a judicial admission that she was injured in an incident that occurred after the motor vehicle collision, and that she aggravated her collision-related injuries as a result. Specifically, he points to plaintiff's answers to interrogatories, wherein she stated as follows:

> "Plaintiff had an incident at a ball game where a woman was falling down and grabbed her head to break her fall. Plaintiff believes that if she did not have this occurrence it would not have injured her, but because of the injuries from this car accident, this incident aggravated her head injury."

¶ 72    Certainly, the facts surrounding the incident plaintiff described, and whether she experienced pain as a result of what occurred, constituted facts that were within her knowledge. However, "[f]or evidence of a prior injury to be admissible at trial, the evidence must be relevant," in that "the evidence of the prior injury must make the existence of a fact that is of consequence either more or less probable." *Voykin*, 192 Ill. 2d at 57. In *Voykin*, the supreme court explained

- 28 -

that there were three purposes for the introduction of evidence of a prior injury in a negligence case: "(1) to negate causation; (2) to negate or reduce damages; or (3) as impeachment." *Id.*

¶ 73　　　In *Voykin*, the supreme court additionally held that expert testimony is typically necessary to establish the relevance of a prior injury to a current one. *Id.* at 58-59. Specifically, the court stated as follows:

> "Without question, the human body is complex. A prior foot injury could be causally related to a current back injury, yet a prior injury to the same part of the back may not affect a current back injury. In most cases, the connection between the parts of the body and past and current injuries is a subject that is beyond the ken of the average layperson. Because of this complexity, we do not believe that, in normal circumstances, a lay juror can effectively or accurately assess the relationship between a prior injury and a current injury without expert assistance. Consequently, we conclude that, if a defendant wishes to introduce evidence that the plaintiff has suffered a prior injury, whether to the 'same part of the body' or not, the defendant must introduce expert evidence demonstrating why the prior injury is relevant to causation, damages, or some other issue of consequence. This rule applies unless the trial court, in its discretion, determines that the natures of the prior and current injuries are such that a lay person can readily appraise the relationship, if any, between those injuries without expert assistance." *Id.* at 59.

The holding in *Voykin* has been extended to evidence of subsequent intervening injuries in addition to prior injuries. *Campbell v. Autenrieb*, 2018 IL App (5th) 170148, ¶¶ 32-33, 109 N.E.3d 332 (citing cases).

¶ 74　　　In this instance, nothing in the record suggests plaintiff possessed the requisite

knowledge to determine the relationship, if any, between her physical condition following the ball game incident she described in her answers to interrogatories and any of her injuries from the motor vehicle collision. Notably, plaintiff referenced only the aggravation of a "head injury" in her answer, which defendant seeks to conclusively link to her need for neck surgery. As described in *Voykin*, however, the human body is complex, and such complexities necessitate expert evidence to assist laypersons in accurately assessing the relationship between separately caused injuries. *Voykin*, 192 Ill. 2d at 59. Defendant fails to identify anything about the nature of the injuries at issue in this case that would render expert assistance unnecessary. Thus, because defendant lacked the necessary expert medical testimony or evidence to establish the relevance of plaintiff's alleged intervening injury, the trial court did not err by granting plaintiff's motion to exclude such evidence.

¶ 75                                C. Cumulative Error

¶ 76            Finally, on appeal, defendant argues a new trial is warranted because the cumulative effect of the errors he alleges on appeal deprived him of a fair trial. See *Netto v. Goldenberg*, 266 Ill. App. 3d 174, 184, 640 N.E.2d 948, 956 (1994) ("A new trial is necessary when the cumulative effect of trial errors so deprives a party of a fair trial that the verdict might have been affected."). However, given our holding that there was either no error or no prejudicial error as alleged by defendant, we also find no cumulative error warranting a new trial. See *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 806, 776 N.E.2d 262, 302 (2002) (indicating that the cumulative error doctrine does not apply where a defendant is not prejudiced by the few errors that occurred in the case).

¶ 77                                III. CONCLUSION

¶ 78            For the reasons stated, we affirm the trial court's judgment.

¶ 79        Affirmed.